**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CAUSE NO.: 1:16-CR-55-TLS-SLC |
| | 1:20-CV-171-TLS |
| KEENAN DAVIS | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Keenan Davis' Motion for Leave of Court to File Untimely § 2255 Writ Pleading [ECF No. 145] and his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF Nos. 151, 181]. For the reasons set forth below, the Court denies the request to file an untimely § 2255 motion and dismisses the Defendant's § 2255 motion.

**BACKGROUND**

The Superseding Indictment charged the Defendant with two counts of being a felon in possession of a firearm. ECF No. 38. On February 24, 2017, the jury returned a guilty verdict on both counts. ECF No. 65. On August 30, 2017, the Court sentenced the Defendant to 100 months imprisonment. ECF Nos. 100, 101. The Defendant's trial attorney filed a Notice of Appeal on August 31, 2017, ECF No. 102, and the Seventh Circuit Court of Appeals affirmed the conviction on July 24, 2018. *See* Appeal No. 17-2814, DE 37. On August 7, 2018, the Defendant filed a pro se petition with the Seventh Circuit, asking for an en banc rehearing of his appeal. *Id.* at DE 39. On August 22, 2018, the Seventh Circuit denied the motion. *Id.* at DE 42.

On November 1, 2019, the Defendant filed the instant Motion for Leave of Court to File Untimely § 2255 Writ Pleading [ECF No. 145]. On November 4, 2019, the Court entered an Order [ECF No. 146] setting a deadline of November 18, 2019, for a Government response. On

the Government's motion, the Court entered an Order [ECF No. 148] on November 13, 2019,

extending the Government's response deadline to November 25, 2019. The Government filed its

Response [ECF No. 149] on November 25, 2019, and the Defendant filed a Reply [ECF No. 150]

on December 13, 2019.

On April 24, 2020, the Defendant filed an unsigned Motion Under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. ECF No. 151. However,

he filed a pro se Motion for Compassionate Release on June 23, 2020, and a supplemental

motion by counsel on August 10, 2020. ECF Nos. 152, 160. The Court denied the motion on

September 14, 2020. ECF No. 164. The Defendant appealed, and the Seventh Circuit Court of

Appeals affirmed the Court's ruling on February 17, 2022, and issued its mandate on March 11,

2022. ECF No. 179. On May 9, 2022, the Defendant timely filed a signed copy of his § 2255

motion at the Court's direction, ECF No. 181, and the Government filed a response on July 1,

2022, ECF No. 183.

## ANALYSIS

### I.    Motion for Leave of Court to File Untimely § 2255 Writ Pleading [ECF No. 145]

In the Motion for Leave of Court to File Untimely § 2255 Writ Pleading [ECF No. 145]

("Motion to Extend Time"), filed on November 1, 2019, the Defendant asks the Court for an

extension of time to file a motion under 28 U.S.C. § 2255. He represents that, although "it is

unclear when the Appeal was actually denied, it is thought . . . that he is not too far off from the

one (1) year limitation." Mot. to Extend Time ¶ 6, ECF No. 145.

### A.    Statute of Limitations

The strict statute of limitations for actions brought under 28 U.S.C. § 2255 is

governed by § 2255(f), which provides:

> A 1-year period of limitation shall apply to a motion under this section. The limitation shall run from the latest of—
>
> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). In his motion, the Defendant does not argue that government action impeded him from making his motion, that the Supreme Court has recognized a new right and made that right retroactively applicable to cases on collateral review, or that new facts supporting his claim were discovered. Therefore, the 1-year period of limitation runs from the date his judgment of conviction became final. *See id.* § 2255(f)(1).

> For purposes of the 1-year period of limitation under 28 U.S.C. § 2255(f)(1),
>
> [w]hen a defendant in a federal prosecution takes an unsuccessful direct appeal from a judgment of conviction, but does not next petition for a writ of certiorari from [the Supreme Court] . . . a judgment of conviction becomes final when the time expires for filing a petition for certiorari contesting the appellate court's affirmation of the conviction.

*Clay v. United States*, 537 U.S. 522, 524–25 (2003); *see also United States v. Moore*, 282 F. App'x. 453, 454–55 (7th Cir. 2008). "The time to file a petition for writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate." Sup. Ct. R. 13(3). But, "if a petition for rehearing is timely filed in the lower court . . . the time to file a petition for a writ of certiorari . . . runs from the date of the denial of rehearing." *Id.*

3

The Seventh Circuit Court of Appeals affirmed the Defendant's conviction on July 24, 2018, and denied rehearing on August 22, 2018. Thus, the Defendant had until November 20, 2018, to petition the Supreme Court to grant a writ of certiorari. *See* Sup. Ct. R. 13(1) (establishing the 90-day time limit to petition the Supreme Court for a writ of certiorari). As a result, the one-year statute of limitations provided the Defendant, as a prisoner acting without an attorney, until the close of business on November 20, 2019, to deliver his § 2255 motion to the prison authorities to be forwarded to the Clerk of this Court. *See United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) ("The first day of the 1-year limitation period is the day after the Supreme Court denies certiorari, giving defendants until the close of business on the anniversary date of the certiorari denial to file their habeas motion."); *see also Jones v. Bertrand*, 171 F.3d 499, 501 (7th Cir. 1999) ("Therefore, for the purposes of a prisoner filing a *pro se* notice of appeal, the Supreme Court adopted a bright line test and held that it is timely filed for statute of limitations purposes so long as it is delivered to the prison authorities before the 30-day statute of limitations has expired and not when it is actually received by the clerk." (citing *Houston v. Lack*, 487 U.S. 266, 275–76 (1988))).

The instant Motion to Extend Time, filed on November 1, 2019, was filed within the one-year period of limitation that ended on November 20, 2019. However, the Defendant's Motion to Vacate Under § 2255 was untimely because it was not filed until April 24, 2020, approximately five months after the limitations period expired. This Court cannot consider a late filed motion absent the extraordinary remedy of equitable tolling. *Ademiju v. United States*, 999 F.3d 474, 477 (7th Cir. 2021).[1]

---

[1] The Seventh Circuit has explained:

> Foreclosing litigants from bringing their claim because they missed the filing deadline by one day may seem harsh, but courts have to draw lines somewhere, statutes of limitation protect important social interests, and limitation periods work both ways—you can be sure

Before turning to the equitable tolling analysis, the Court considers whether the arguments raised in the unsigned April 24, 2020 Motion to Vacate Under § 2255 and the identical signed May 9, 2022 Motion to Vacate Under § 2255 (collectively "Motion to Vacate Under § 2255") relate back to any facts alleged in the November 1, 2019 Motion to Extend Time such that the arguments would be timely; the Court finds that they do not. *See Mayle v. Felix*, 545 U.S. 644, 650 (2005) (strictly construing relation back under Federal Rule of Civil Procedure 15(a) in the habeas context and holding that an amended habeas petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth"); *see also Socha v. Boughton*, 763 F.3d 674, 683 (7th Cir. 2014) (*Socha II*) (affirming the district court's conclusion that the motion for extension of time, which was filed within the limitations period, could not serve as the actual habeas petition because "it did not reveal any reasons for justifying relief").

The grounds for relief raised in the Motion to Vacate Under § 2255 are (1) ineffective assistance of counsel at trial based on failure to make hearsay objections, failures regarding a hostile witness, and failure to object to a minor witness on competency grounds, (2) vindictive prosecution based on a witness changing his story with the government's knowledge, and (3) error of the Court for failing to voir dire the hostile witness. *See* Mot. to Vacate Under §2255 ¶ 12, ECF Nos. 151, 181. No facts supporting any of these grounds for relief were alleged in the Motion to Extend Time, in which the Defendant states generally that his § 2255 motion will assert ineffective assistance of counsel for failing to consult him on the appeal and for failing to

---

Marcello and Zizzo would not be pooh-poohing the prosecution's tardiness if they had been indicted one day after the statute of limitations expired for their crimes.

*Marcello*, 212 F.3d at 1010 (citing *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452–53 (7th Cir. 1990)).

advise him that his appeal had been denied. *See* Mot. to Extend Time ¶¶ 3, 4. And, in his reply brief in support of his Motion to Extend Time, the Defendant states that "[h]e need not show any grounds or issue he would raise on his § 2255 pleading at" the time of filing his Motion to Extend Time. Def. Reply ¶ 8, ECF No. 150. Thus, it appears that the Defendant did not intend for his Motion to Extend Time to serve as his § 2255 motion. For all these reasons, the Court finds that the Motion to Extend Time does not serve as the Defendant's § 2255 motion.

**B.     Equitable Tolling**

Turning to whether equitable tolling permits the filing of the Defendant's Motion to Vacate Under § 2255 after the statutory deadline, the Court finds that it does not. The statute of limitations in § 2255 is not jurisdictional and can be equitably tolled. *See Holland v. Florida*, 560 U.S. 631, 645, 649 (2010) (holding that the AEDPA statute of limitations defense is nonjurisdictional and therefore subject to equitable tolling as applied to a § 2254 petition); *see also Lombardo v. United States*, 860 F.3d 547, 551 (7th Cir. 2017) (applying the equitable tolling standard of *Holland* to a motion filed under 28 U.S.C. § 2255); *Estremera v. United States*, 724 F.3d 773, 775 (7th Cir. 2013) ("*Holland* deals with state prisoners' petitions under § 2254, but its conclusion is equally applicable to federal prisoners' petitions under § 2255.").

A movant "is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (internal quotation marks omitted) (quoting *Pace v. DeGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Lombardo*, 860 F.3d at 551 (citing *Holland*, 560 U.S. at 649). It is the movant's burden to establish both elements. *See Socha II*, 763 F.3d at 683–84 (citing *Tucker v. Kingston*, 538 F.3d 732, 734 (7th Cir. 2008)); *see also Mayberry v. Dittmann*, 904 F.3d 525, 529–30 (7th Cir. 2018). "The realm of equitable tolling is a highly

6

fact-dependent area in which courts are expected to employ flexible standards on a case-by-case basis." *Socha II*, 763 F.3d at 684 (internal quotation marks omitted) (quoting *Socha v. Pollard*, 621 F.3d 667, 672 (7th Cir. 2010) (*Socha I*)). Nevertheless, equitable tolling is rare and "reserved for extraordinary circumstances far beyond the litigant's control that prevented timely filing." *Id.* (quoting *Nolan v. United States*, 358 F.3d 480, 484 (7th Cir. 2004)); *see also Carpenter v. Douma*, 840 F.3d 867, 870 (7th Cir. 2016).

The Defendant does not use the term "equitable tolling" in his Motion to Extend Time, but he argues that he could not file a timely § 2255 motion because he "was not properly advised the appeal had been denied" and because he is not an attorney and has no training in the field of law. Mot. to Extend Time ¶¶ 3, 6. The Government responds that these arguments are disingenuous given that the Defendant filed a pro se motion for rehearing en banc of the denial of his appeal. The Government argues that any subsequently filed § 2255 motion should be denied as untimely and that equitable tolling should not permit the late filing. In his reply brief, Defendant contends that being on lockdown at his prior institution and his lack of legal training constitute extraordinary circumstances and that he was diligent in pursuing his rights.

1.   *Extraordinary Circumstances*

"'Extraordinary circumstances' are present only when an 'external obstacle' beyond the party's control 'stood in [its] way' and caused the delay." *Lombardo*, 860 F.3d at 552 (citing *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 756 (2016)). The Court "must evaluate the circumstances holistically, considering 'the entire hand that the [movant] was dealt' rather than taking each fact in isolation." *Gray v. Zatecky*, 865 F.3d 909, 912 (7th Cir. 2017) (quoting *Socha II*, 763 F.3d at 686). In this case, the facts viewed as a whole do not merit a finding of extraordinary circumstances.

First, the Defendant asserts that "it appears that [he] was not *properly* advised the appeal had been denied." Mot. to Extend Time ¶ 3 (emphasis added). However, the Defendant filed a pro se motion for rehearing en banc of the Court of Appeals' denial of his appeal. The pro se motion for rehearing en banc was handwritten, included a copy of the Seventh Circuit Court of Appeals' July 24, 2018 opinion denying his appeal, was mailed on August 1, 2018, and was received by the Court of Appeals on August 7, 2018. In his reply brief, the Defendant does not dispute that he was timely aware that his appeal had been denied; instead, he emphasizes that he was not "properly" advised that the appeal had been denied but found out on his own. The Defendant fails to explain what constitutes being "properly" advised or how he was prejudiced by the way he learned that his appeal had been denied. The Court finds no prejudice as the Defendant was aware of the denial of his appeal and timely sought rehearing en banc. Thus, the purported external obstacle—the way the Defendant learned that his appeal was denied—does not constitute an extraordinary circumstance, either on its own or in combination with any other facts.[2]

Second, the Defendant asserts that the time to file a § 2255 motion should be extended because of his lack of legal training. The "lack of legal knowledge, [a] feature shared by the overwhelming majority of prisoners, by itself [is not] enough to justify equitable tolling." *Socha II*, 763 F.3d at 685 (citing *Taylor v. Michael*, 724 F.3d 806, 811 (7th Cir. 2013)); *see also Davis v. Humphreys*, 747 F.3d 497, 500 (7th Cir. 2014) ("[I]t is established that prisoners' shortcomings of knowledge about the AEDPA or the law of criminal procedure in general do not support tolling."). The Defendant does not describe any effort that he made to do research, access

---

[2] He does not make this argument in relation to the denial of his motion for rehearing en banc. He offers no facts as to when or how he learned that his motion for rehearing en banc was denied.

legal resources, or visit a law library at any point during his incarceration other than the fact of relying on other prisoners to help him. *See* Mot. to Extend Time ¶ 6; Def. Reply ¶¶ 3, 4, 5, 7.

Third, the Defendant asserts for the first time in his reply brief: "He just came to his new assigned institution from the infamous prison called [Hazelton] USP. He was on lock down for many months, without access to the law library." Def. Reply, p. 2 ¶ 3. And he argues that this circumstance was outside of his control. *Id.* ¶ 4. Indeed, the lack of access to a law library can be a "substantial factor in determining whether extraordinary circumstances exist to justify equitable tolling, and may also permit statutory tolling" under § 2255(f)(2). *Richardson v. Thompson*, No. 16 C 7422, 2019 WL 3573578, at *12 (N.D. Ill. Aug. 6, 2019); *see also Estremera*, 724 F.3d at 777 (holding that lack of library access may allow additional time under § 2255(f)(2), separate from any common law equitable tolling or equitable estoppel).

Because this argument was not raised in the original motion but rather for the first time in the reply brief, the argument is waived. *See Wright v. United States*, 139 F.3d 551, 553 (7th Cir. 1998) ("If the sufficiency argument was not made in Wright's initial brief to this court, it should have been considered waived, despite the fact that the defendant was proceeding pro se." (citing *Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992); *United States v. Feinberg*, 89 F.3d 333, 340–41 (7th Cir. 1996), *cert. denied*, 519 U.S. 1133 (1997))).

Nevertheless, even if the argument had been properly raised, the Defendant offers no details of the dates or length of time he was at USP Hazelton, nor does he indicate the number of days or months that he was on lockdown during the relevant period. He does not indicate how long he was at the new facility (FCI Schuylkill) after being transferred from USP Hazelton and prior to filing his Motion to Extend Time on November 1, 2019. Nor does he describe any effort to pursue a § 2255 motion when he was not on lockdown at either location. All this information

9

is within the Defendant's personal knowledge, yet he has offered nothing but conclusory allegations of the effect of a lockdown on his library access during the period in question. *See, e.g.*, *United States v. Hayes*, No. 19 C 50104, 2020 WL 2112367, at *4 (N.D. Ill. May 4, 2020) (finding that the defendant had "not shown that he was 'deprived of meaningful library access'" (quoting *Gray*, 865 F.3d at 913)); *Magee v. Butler*, No. 14-CV-6879, 2015 WL 5951877, at *6 (N.D. Ill. Oct. 13, 2015) (citing cases) (noting that the petitioner had only made "conclusory allegations regarding the extent of the lockdowns during the time period in question" and finding the "total lack of evidence regarding Petitioner's attempts to access the law library and the impact of lockdown on Petitioner's ability to prepare his petition foreclose Petitioner's arguments on both the 'diligence' and the 'extraordinary circumstance' prongs of the equitable tolling analysis").

Thus, the Defendant has not shown that he was deprived of meaningful access to the law library, even when considered in combination with his lack of legal training. *See Gray*, 865 F.3d at 913 (describing institutional lockdowns that lasted from two weeks to ten months with two lockdowns in the prior three months lasting a total of three weeks); *Socha II*, 763 F.3d at 680 (noting that, once the petitioner finally received his file from his lawyer, he was being held in administrative segregation, was unable to access the main law library, and was subject to numerous restrictions in segregation); *Taylor*, 724 F.3d at 811–12 ("When an inmate, despite roadblocks thrown in his way, has reasonable time remaining to file a habeas petition in a timely manner, the circumstances cannot, as a definitional matter, be said to have prevented timely filing, as the standard requires.").[3]

---

[3] Unlike in *Gray* and *Socha*, the Defendant does not assert any delay in obtaining the files he needed to prepare his petition that could have combined with the lack of access to a law library to constitute an extraordinary circumstance. *See Gray*, 865 F.3d at 913 ("Most important, Gray and Socha both experienced long delays in obtaining the files they needed to prepare their petitions."). In fact, in his reply

Finally, the Court considers whether the briefing schedule it set on the Defendant's Motion to Extend Time constitutes an extraordinary circumstance that would warrant equitable tolling. On November 4, 2019, the Court set a deadline of November 18, 2019, for the Government's response to the November 1, 2019 Motion to Extend Time. On the Government's motion, the Court extended the deadline to November 25, 2019, which was after the statute of limitations would run on November 20, 2019. The Defendant argues in his reply brief that "[w]e very well could have been on time had the Government not sought a delay in filing their Opposition." Def. Reply p. 2 ¶ 3. This argument is not well taken. If the Defendant was able to file within the limitations period, as he indicated, no ruling on his Motion to Extend Time was needed at all, and any Government response would also have been unnecessary. As noted above, the Defendant represented in his November 1, 2019 Motion to Extend Time that he anticipated that his § 2255 motion "should be filed in short order, meaning within fourteen (14) days." Mot. to Extend Time ¶ 6. And in the same paragraph of the motion, he states that "it is thought by [Defendant] that he is not too far off from the one (1) year limitation." *Id.*

More importantly, the Defendant does not explain why he did not in fact file a § 2255 motion within fourteen days, which would have been November 15, 2019, and within the one-year limitations period. Similarly, he offers no indication in his reply brief that he would need an additional five months to file a § 2255 motion, which he eventually filed on April 24, 2020. Nor does he offer any such explanation in the April 24, 2020 Motion to Vacate Under § 2255. *See* Apr. 24, 2020 Mot. to Vacate Under § 2255, p. 12 ¶ 18.

In *Socha II*, the petitioner filed a motion to extend the deadline the day before the limitations period expired, the district court granted him a 90-day extension of time to file the

---

brief, the Defendant states that he "has a nearly 18" thick stack of documents pertaining to his case, he did not need anything more, what he required is research by those who were helping him." Def. Reply ¶ 5.

habeas petition, and the petition was filed prior to the extended deadline. *Socha II*, 763 F.3d at 680. However, a subsequent district court judge held that the court had lacked jurisdiction to grant an extension of time before the deadline expired, vacated the extension of time, and found the petition to be untimely. *Id*. at 680–81. On appeal, the Court of Appeals explained that, at the time of initially ruling on the motion for extension of time, which was one day before the limitations period expired, the district court had all the facts necessary related to equitable tolling and "there was no bright-line bar on [the court's] actions." *Id.* at 687 (citing *Socha I*, 621 F.3d at 671–72). Finding that the original extension of time should not have been reversed and considering all the circumstances in that case, the Court of Appeals found that the second district court judge abused his discretion in finding that the petitioner did not face extraordinary circumstances. *Id.*

The Defendant in this case is like the petitioner in *Socha II* in that he filed his Motion to Extend Time prior to the expiration of the limitations period. But unlike the petitioner in *Socha II*, the Defendant did not assert any "nearly insurmountable" hurdles he faced during the relevant period that constitute extraordinary circumstances. *Id.* at 686. In *Socha II*, the Court of Appeals found that the petitioner's "efforts to file a petition within one year . . . were hampered at every turn, through no fault of his own." *Id.* at 679. The petitioner had diligently attempted for more than a year to obtain his case file from the public defender who represented him at trial, and the case file was essential to preparing his claims of ineffective assistance of counsel and withholding of exculpatory evidence. *Id.* When the petitioner finally received the two boxes of materials (which were in a terrible disarray), less than six weeks remained of the limitations period and he was being held in administrative segregation, which prevented him from using the main law library and created many hindrances. *Id*. at 680, 684. No such circumstances exist here.

Viewed as a whole, the reasons that the Defendant offers—lack of legal training and, if considered, segregation for some unspecified period—are "nothing but ordinary." *Carpenter*, 840 F.3d at 870. The Defendant has not identified an external obstacle beyond his control that prevented him from filing a § 2255 motion prior to November 20, 2019, and thus has not shown extraordinary circumstances.

2.      *The Defendant's Diligence*

The Defendant also has not met his burden of showing that he was diligent in attempting to file a § 2255 motion. "The diligence required for equitable tolling purposes is reasonable diligence . . . not maximum feasible diligence." *Holland*, 560 U.S. at 653 (internal citations and quotation marks omitted) (finding that the district court incorrectly concluded that the petitioner was not diligent when the petitioner had written "his attorney numerous letters seeking crucial information and providing direction," had repeatedly contacted the state courts and other entities to have the attorney removed from his case, and, on the day he learned the AEDPA clock had expired, filed a pro se petition with the court).

The Defendant offers no facts regarding his diligence. Instead, he asserts, as discussed above, that he was "not properly advised the appeal had been denied" and that the limitations period should be tolled "by virtue of just learning his appeal has been denied." Mot. to Extend Time ¶ 3. However, when pressed by the Government's argument that he timely knew his appeal had been denied because he filed a pro se motion for rehearing en banc, the Defendant's reply brief newly asserts that the focus of this argument is not that he was unaware of the denial of his appeal but rather that he was not "properly" advised of the denial.

The Government notes that there was no activity on this Court's docket during the relevant period other than a letter by the Defendant in June 2019 regarding his eligibility under

13

the First Step Act. However, the inactivity on this Court's docket does not inform the diligence inquiry if the Defendant was attempting to gather information, research, and draft while incarcerated. Indeed, the Defendant explains in his reply brief that he did not need anything further from this Court because he had all the documents he required (18" of paperwork). Def. Reply ¶ 5.

Nevertheless, the Defendant does not describe any steps he took prior to the expiration of the statute of limitations to learn about his remedies and file a motion under § 2255. Instead, he says only that "what he required is research by those who were helping him." *Id*. The Defendant waited until three weeks before the November 20, 2019 expiration of the statute of limitations to request an extension of time. As discussed above, the Defendant asserts for the first time in his reply brief that he was in lockdown while incarcerated at USP Hazelton with no access to a law library. But again, Defendant offers no details of how long he was incarcerated at USP Hazelton, the length of time he was in lockdown there, or when he was transferred to FCI Schuylkill, all of which would inform the diligence inquiry.

In *Socha II*, the court found that the petitioner's "diligence is best evaluated in light of [the] broader picture" of the extraordinary circumstances he faced and concluded that the petitioner was diligent given those circumstances. *Socha II*, 763 F.3d at 684. As in *Socha II*, the court in *United States v. Jones* found that the defendant had shown he was reasonably diligent when he initially sought records more than three months before the statutory deadline, he did not receive the documents until two days before the deadline, he was in a three-week prison lockdown until six days before the statutory deadline and immediately filed a motion for extension of time on the day the lockdown was lifted, and he still filed his § 2255 motion less than one month after the lockdown was lifted. No. 19 C 1947, 2020 WL 2526478, at *4–5 (N.D.

14

Ill. May 18, 2020). Here, the Defendant did not face extraordinary circumstances that impacted his ability to diligently prepare his motion.

Finally, the Defendant's failure to follow through on the representation that he anticipated filing his § 2255 petition within fourteen days of his November 1, 2019 Motion to Extend Time further demonstrates a lack of reasonable diligence. Instead, he waited over five months to file his Motion to Vacate Under § 2255 on April 24, 2020. For all these reasons, the Defendant has not shown that he was reasonably diligent in pursuing his rights.

In conclusion, the Defendant's § 2255 motion is untimely, and he has not satisfied his burden of showing that equitable tolling is appropriate in this case. Therefore, the Court denies the motion for extension of time and dismisses the Defendant's § 2255 motion.

## II.    Merits of the Defendant's § 2255 Motion

Although the Court need not consider the merits of the § 2255 motion given its dismissal as untimely, the Court nevertheless finds that motion would have been denied. Under 28 U.S.C. § 2255(a), a prisoner convicted of a federal crime may move the sentencing court to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Motions to vacate a conviction or sentence ask the district court to grant an extraordinary remedy to one who already has had an opportunity for full process." *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006). Generally, § 2255 petitioners "may not raise any issue that they might have presented on direct appeal." *Cross v. United States*, 892 F.3d 288, 294 (7th Cir. 2018) (citing *McCoy v. United*

*States*, 815 F.3d 292, 295 (7th Cir. 2016)). Before turning to the Defendant's arguments, the Court provides the relevant background trial evidence and proceedings.

**A.     Background**

*1.     Count 1—July 20, 2016*

Count 1 charged the Defendant with being a felon in possession on July 20, 2016. On that date, the Defendant drove with his girlfriend, Heather Gaff (Heather), to the home of Anthony Wamue and Jacqueline Gaff (Jackie), the Defendant's ex-girlfriend and Heather's sister. *See United States v. Davis*, 896 F.3d 784, 786 (7th Cir. 2018). The Defendant, Wamue, and Jackie were all felons. *Id*. As the Defendant walked to Jackie's front door, her neighbor Mauricia Causey saw the butt of a gun in his waistband. Tr. 435–36, 450. The Defendant's visit quickly escalated into a fight involving him, Jackie, and Wamue that started in the house and spilled into the backyard. *Davi*s, 896 F.3d at 786. At trial, Jackie testified that the Defendant pushed her to the ground, pulled out a black handgun, and held it to her head. Tr. 262. Wamue and C.D. (the Defendant's and Jackie's six-year-old daughter) ran in from a bedroom. Tr. 264–65, 333–34. From outside the apartment, neighbor Linda Bergman heard the Defendant yell, "I'm going to kill you." Tr. 391.

Wamue then "jumped in" and began struggling with the Defendant. Tr. 265, 336. Wamue got control of the gun and ran out the back door yelling for somebody to call the police. Tr. 337–39. The Defendant tackled Wamue from behind. Tr. 341. During the melee, Wamue dislodged the magazine from the gun. Tr. 343–44. Heather grabbed the magazine and fled. Tr. 344. Eventually, Wamue restrained the Defendant in a headlock, and Jackie dropped the gun near the parking lot curb. Tr. 272–74, 306, 348–49, 365. The Defendant continued to curse and struggle

even after the police arrived. Tr. 445, 471, 480. Officer Matthew Cline recovered the gun and

transported the Defendant from the scene. Tr. 566–70.

During the fight, six people called 911, including Bergman, Causey, and Jackie's oldest

child, who gave the phone to Jackie. Tr. 275–77, 383, 437; Tr. Ex. 1 (audio 911 calls); *see* ECF

No. 66. Causey told 911 she "thought [the Defendant] had a gun on him when I seen him um

reaching for his [waistband]." Ex. 1 (Track #3 0:25–0:28). Jackie twice told 911 that the

Defendant put the gun barrel to her head. *Id.* (Track #6, 0:19-0:25, 0:49-1:07, 1:54-2:01).

a.      Jackie's Trial Testimony

At trial, the Defendant's attorney questioned Jackie about the fight's specifics; Jackie

could not recall many details. *Davis*, 896 F.3d at 787. The things she did not remember included

(a) whether the Defendant was wearing pants or shorts, Tr. 292, (b) whether Heather entered the

apartment, Tr. 301, (c) how Wamue held the gun when he handled it, Tr. 305, (d) what Jackie

said on the 911 call, Tr. 308, and (e) whether the magazine was in the gun, Tr. 305–07. The

Defendant's attorney also asked whether Jackie told Officer Cline the magazine fell out during

the struggle, and she could not recall making the statement. Tr. 307.

b.      Officer Cline's Trial Testimony

At trial, the government called Officer Cline, who testified without objection that, while

on-scene, he spoke to Jackie and Wamue. Tr. 573–77. Officer Cline testified that Jackie told him

that the Defendant knocked on her door and, when she opened it, pushed his way in. Tr. 573. The

Defendant pointed a gun at her head and pushed her with it, causing her to fall backward to the

ground. *Id.* She yelled for Wamue, who started fighting the Defendant. *Id.* When the fight moved

outside, Jackie went to the backyard and helped take the gun away from the Defendant. Tr. 573–

74. She told Officer Cline that, during the fight, the magazine came loose and Heather left with

it. Tr. 575–76. Officer Cline testified that Wamue told him he heard Jackie call for help and saw her fighting with the Defendant. Tr. 576. He said he saw a gun, which he tried to get away from the Defendant. *Id.* He ran out with the gun, the Defendant followed him, and they fought again. *Id.* Wamue said that Jackie helped get the gun from the Defendant. Tr. 577.

c.      C.D.'s Trial Testimony

The Defendant's attorney filed a pretrial motion asking the Court to hold an 18 U.S.C. § 3590(c) child competency hearing before letting C.D. testify. ECF No. 53. The Court agreed and questioned C.D. outside the jury's presence about her ability to distinguish between truth and falsehood. Tr. 738–49. The Court found that C.D. understood what a promise was as well as the difference between the truth and a lie. Tr. 749. After the Court made these findings, the Defendant's attorney did not object to her testimony. *Id.*

C.D. testified she lived with her mommy and daddy ("Anthony") but had another daddy, the Defendant. Tr. 754–55. She testified that, one day the prior summer, she was watching television when she heard banging on the door and Jackie screaming. Tr. 755. She and Wamue ran into the hallway, where she saw Jackie and the Defendant. Tr. 755–56. On cross-examination, the Defendant's attorney implied that Jackie had coached C.D.'s testimony. Tr. 759–63. C.D. agreed that she remembered the day "because my mommy told me I have to remember it" but denied that Jackie told her what to say or remember. Tr. 760. C.D. testified that after she went down the hall she ran to get her brothers and then looked out the window and "saw . . . daddy Anthony trying to get the gun from Keenan." Tr. 761–62. The Defendant's attorney asked how she remembered the gun. Tr. 762. C.D. responded, "No, I haven't seen the gun, but I know that he had it because–well, my mom told me he had a gun." Tr. 762. On further questioning, C.D. confirmed to the Defendant's counsel that "mommy told you daddy Kennan

had a gun." Tr. 763. On redirect, the government asked C.D. whether the Defendant "had anything with him" when C.D. came down the hall. Tr. 764. C.D. said that the Defendant "had a gun and he had TeTe," her nickname for Heather. Tr. 764.

d.      Closing Argument

In closing arguments, the Defendant's attorney asserted that Jackie and Wamue "set up" the Defendant. Tr. 939; *see also Davis*, 896 F.3d at 786. He pointed out inconsistencies in Jackie's testimony, noting that Jackie told Officer Cline she was "knocked down by the pistol" but testified at trial that the Defendant pushed her to the ground before pulling out the gun. Tr. 941. Further, he noted that Jackie told Officer Cline that Heather took the magazine but when asked by the government at trial, "she just didn't remember." Tr. 949. The Defendant's attorney also pointed out an inconsistency in Wamue's testimony: Wamue testified that when he had the Defendant in a headlock, the Defendant was lying next to him, yet two witnesses said Wamue was on top of the Defendant. Tr. 947; *see also* TR. 362, 366–67.

2.      *Count 2—August 30, 2016*

The Defendant lived in a four-bedroom house with Heather, his 23-year-old son Kennan Davis, Jr. ("J.R."), Jim Bob Sullivan, a man named Reggie, and two other women. *Davis*, 896 F.3d at 787. On August 30, 2016, officers executed a warrant for the Defendant's arrest at the home. *Id.* In the mudroom, they saw the barrel of a stolen revolver sticking out of a Crown Royal bag. *Id*. During a pat down of the Defendant, an officer found a Crown Royal bag tied to the Defendant's boxer shorts. *Id.*

The Defendant's attorney called Sullivan and Heather to testify. Sullivan claimed he had never seen the Crown Royal bag and never saw a firearm at the house. Tr. 842–43. He admitted that he was arrested the day of the search for possessing narcotics and used illegal drugs two

days before his arrest. Tr. 854–55. Heather said she found the gun in a chair while vacuuming and Reggie claimed it was his. Tr. 870–71, 894.

The government called J.R. to testify. Tr. 604. At a bench conference prior to J.R. taking the stand, the government sought permission to lead, asserting that J.R. would likely be a hostile witness. *Id.* In support, the government reported that it had reached out to talk to J.R. but he had not responded. Tr. 604–05. The Court asked if the parties wanted to voir dire J.R. or "just take him as he is." Tr. 605. The Defendant's attorney stated he did not object to J.R. testifying. *Id.* However, he asked if the Court would permit him to conduct "what would have been my direct of . . . J.R." for efficiency purposes, to which the Court agreed. Tr. 606.

Regarding Count 1, J.R. testified that he was at work on July 20, 2016, and was not with the Defendant at Jackie's apartment. Tr. 612. Turning to August 30, 2016, on questioning from the government, J.R. testified that an ATF agent showed him a firearm, and J.R. told the agent it was his. Tr. 614, 629. On cross-examination by the Defendant's attorney, J.R. testified that his statement to the agent was a lie as he had never seen the firearm or the Crown Royal bag before August 30, 2016. Tr. 621–23. J.R. denied telling the agent that the gun belonged to the Defendant or that the agent even asked that question. Tr. 614–15. He testified he never saw the Defendant with the weapon. Tr. 623–24. After J.R. testified, the government called ATF Agent Wayne Lessner, who had interviewed J.R. *Davis*, 896 F.3d at 788. Agent Lessner testified that J.R. said his father had a "smaller" black revolver. *Id.* Agent Lessner showed J.R. the revolver in the Crown Royal bag and asked if that was the firearm he was referring to. *Id.* Agent Lesser testified that J.R. hesitated a few seconds and then said yes. *Id.*

**B.      Ineffective Assistance of Counsel (§ 2255–Ground One)**

An exception to the procedural bar is that ineffective assistance of counsel claims may always be raised under § 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003); *see Ramirez v. United States*, 799 F.3d 845, 852–53 (7th Cir. 2015). A defendant claiming ineffective assistance must show that his "'counsel's performance was deficient' and 'the deficient performance prejudiced the defense.'" *Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). On the performance prong, the Court applies a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (7th Cir. 2011) (quoting *Strickland*, 466 U.S. at 689). "A strategic decision, even if clearly wrong in retrospect, cannot support a claim that counsel's conduct was deficient." *United States v. Yancey*, 827 F.2d 83, 90 (7th Cir. 1987) (citing *Strickland*, 466 U.S. at 689–91). On the prejudice prong, a defendant must show a reasonable probability that the counsel's ineffectiveness affected the proceeding's outcome. *Strickland*, 466 U.S. at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687, 683). The Court considers each of the Defendant's ineffective assistance of counsel arguments in turn.

*1.      Hearsay Objections*

The Defendant argues that his attorney failed to make hearsay objections to certain testimony by Officer Cline regarding out-of-court statements by Jackie. During trial, the government called Jackie to testify about the incident on July 20, 2016, but Jackie could not recall many details of the incident. Subsequently, the government called Officer Cline, the

21

arresting officer, who testified as to statements made by Jackie and others on the day of the incident—statements that were incriminating for the Defendant. The Defendant argues that his attorney should have made a hearsay objection to Officer's Cline's testimony. The Defendant's attorney did not err because the testimony was not hearsay.

The testimony was admissible as non-hearsay under the 2014 amendment to Federal Rule of Evidence 801(d)(1)(B)(ii), which was operative at the Defendant's trial. Rule 801(d)(1)(B)(i) retains the pre-2014 Amendment Rule 801(d)(1)(B) and allows for the substantive use of a witness's prior consistent statement that is offered "to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying." Fed. R. Evidence 801(d)(1)(B)(i). However, the 2014 amendment added Rule 801(d)(1)(B)(ii), which allows for the substantive use of a witness's prior consistent statement to "rehabilitate the declarant's credibility as a witness when attacked on another ground." Fed. R. Evid. 801(d)(1)(B)(ii). This new rule is specifically applicable when a witness is attacked for inconsistency or faulty memory. Fed. R. Evid. 801 advisory committee's note to 2014 amendment. "As before, prior consistent statements under the amendment may be brought before the factfinder only if they properly rehabilitate a witness whose credibility has been attacked." *Id.* The Defendant's attorney asked Jackie and Wamue several questions suggesting that Jackie had a faulty memory or made inconsistent statements. He specifically cross-examined Jackie on the fact that she told Officer Cline the magazine fell out of the gun but now claimed not to remember those events. Tr. 307. The government called Officer Cline to present Jackie's and Wamue's prior consistent statements to refute any claim that her memory was faulty or confused. Thus, the testimony was not hearsay, and there was no error by counsel.

2.      *Testimony of the Defendant's 6-year-old Daughter*

Next, the Defendant makes two arguments related to the testimony of his six-year-old daughter, C.D. First, he argues that his attorney failed to raise a hearsay objection to C.D.'s trial testimony that she knew there was a gun because Jackie, her mother, told her that the Defendant had a gun. Defense counsel's decision not to object to the hearsay statement was strategically reasonable. C.D. testified several times that she saw the Defendant with a gun. Defense counsel's primary argument as to why the jury should reject the testimony was that Jackie had coached C.D. Thus, C.D.'s testimony that Jackie told C.D. that the Defendant had a gun tended to support counsel's argument. There was no strategic reason to object to the hearsay statement. Similarly, the Defendant cannot show that any failure to object prejudiced him because there is no reason to believe that C.D.'s testimony that Jackie told her that the Defendant had a gun made the jury more likely to believe either Jackie or C.D. and thus more likely to convict.

Second, the Defendant argues that his attorney failed to object to C.D. being examined by the Court for competency to testify rather than being examined by a child psychologist or psychiatrist. The Defendant argues that a child psychologist should have been ordered to examine C.D. to determine whether testifying would cause her "long term trauma." The argument is not well taken. A child is presumed competent to testify. 18 U.S.C. § 3509(c)(2). If questions are raised about the child's competency, the statute provides that the district court conducts questioning at a competency hearing. *Id.* § 3509(c)(7). Only if there is "a showing of compelling need" can a court order a psychological or psychiatric examination of a child. *Id.* § 3509(c)(9); *see United States v. Snyder*, 189 F.3d 640, 645 (7th Cir. 1999). The Defendant has not identified any evidence suggesting that his attorney could have shown a compelling need for

such an examination of C.D. The Defendant has not shown that his attorney's handling of C.D. testimony was not within the bounds of competent representation.

3.     *Testimony of J.R.*

The basis for Count 2 of the Indictment arose when the police executed a warrant for the Defendant's arrest at his home on August 30, 2016. The government called the Defendant's adult son, J.R., as a witness in relation to this count. Prior to J.R. testifying, the government informed the Court that it anticipated J.R. would be a hostile witness. The Court offered to conduct a voir dire of J.R., but neither counsel accepted the offer. The Defendant contends that his attorney was ineffective by failing to object to J.R. as a witness and failing to accept the Court's offer to conduct voir dire.

Again, however, defense counsel's strategy not to conduct voir dire of J.R. was reasonable and well within the bounds of minimally competent representation. The Defendant has cited no law that voir dire by defense counsel of a potentially hostile government witness is compulsory. As argued by the government, while defense counsel may have tried to use voir dire to prevent the government from calling J.R., the record shows that defense counsel intended to call J.R. as a witness in his case-in-chief. Thus, allowing voir dire of J.R. could have previewed that direct testimony to the government, ceding an advantage on cross-examination.

Moreover, the Defendant has not shown prejudice from defense counsel's decisions regarding J.R. The government notes that, while J.R. disagreed and was evasive on some points in his testimony, he provided helpful substantive testimony on some aspects of the government's case. For example, J.R. testified he was at work and not at Jackie's apartment on July 20, 2016. Tr. 612. But, in a jail call, the Defendant asked J.R. "[t]o write a statement saying my daddy ain't do that we was with him." Gov. Ex. 45, Track 3. J.R.'s testimony would have allowed the jury to

24

infer that the Defendant was asking J.R. to lie about the July 20, 2016 event, presumably to cover up his own guilt. As for the August 20, 2016 event in Count 2, once J.R. was on the stand, the government was free to impeach his testimony that he had no knowledge of the gun at issue with his out-of-court statement that the gun belonged to the Defendant. And there is no reason to believe that any of this testimony would not have come out anyway if the Defendant had instead first called J.R. as a witness in his case-in-chief. The Defendant has not shown that his counsel's performance was ineffective in relation to J.R.'s trial testimony.

4.      *Speedy Trial Act*

The Defendant contends that his right to a speedy trial was forfeited when his trial attorney failed to advise the government and the Court that a witness ("Sam") had been located. However, the trial record shows that, while the government sought a continuance based on its failure to locate Sam, the Defendant's attorney opposed the continuance and informed the Court that Sam had been found. ECF Nos. 23–25. Although the Court ultimately overruled the objection, *see* ECF No. 32, the Defendant's trial attorney raised a proper objection. Thus, there was no error.

**B.      Vindictive Prosecution (§ 2255–Ground Two) and Error of the Court (§ 2255–Ground Three)**

As Ground Two for his § 2255 motion, the Defendant argues that his conviction should be reversed because he was vindictively prosecuted when the government called J.R. as a witness "[knowing] he was going to change his story or at least commit perjury." May 9, 2022 Mot. for § 2255, p. 6. Similarly, in Ground Three, the Defendant argues that the Court erred when it failed to conduct a voir dire of J.R., knowing him to be a hostile witness based on the government's representation that "J.R. would lie to the jury." *Davis*, 896 F.3d at 790. However, the Seventh Circuit Court of Appeals already held on direct appeal that the government complied with

25

applicable evidentiary rules and did not act in bad faith in calling J.R. as a witness and that the

district court did not err in allowing J.R. to testify. *Davis*, 896 F.3d at 789–90. The Seventh

Circuit reasoned that, because J.R. had not responded to the government's request to talk with

the government before trial, the government did not know how J.R. would testify at trial and

therefore could permissibly call him at trial. *Id*. at 789–90. The Defendant has not made any new

argument on the instant motion regarding his prosecution or the Court's procedures regarding

J.R. that have not already been decided by the Seventh Circuit. Thus, the Defendant has failed to

show vindictive prosecution or any error by the court in relation to this issue.

## CERTIFICATE OF APPEALABILITY

Under Rule 11(a) of the Rules Governing § 2255 proceedings, the Court issues or denies

a certificate of appealability under 28 U.S.C. § 2253(c)(2) when it enters a final order adverse to

the applicant. A certificate of appealability may be issued "only if the applicant has made a

substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rule 11 of

Rules Governing Section 2255 Proceedings. The substantial showing standard is met when

"reasonable jurists could debate whether (or, for that matter, agree that) the petition should have

been resolved in a different manner or that the issues presented were adequate to deserve

encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation

marks omitted). For the reasons set forth above, Defendant's Motion to Vacate Under 28 U.S.C.

§ 2255 is untimely. Because reasonable jurists would not debate whether a different result was

required, the Court declines to issue a certificate of appealability.

## CONCLUSION

Because the § 2255 motion was filed after the statute of limitations expired and because

the Defendant has not established a basis for equitable tolling, the Court DENIES Defendant

26

Keenan Davis' Motion for Leave of Court to File Untimely § 2255 Writ Pleading [ECF No. 145] and DISMISSES the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [ECF Nos. 151, 181].

SO ORDERED on May 18, 2023.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT